JOHN DEN, LESSEE OF POLLY WEATHERHEAD, PLAINTIFF IN ERROR, v. JOHN BASKERVILLE, JOHN WHITE, JOHN PARKER, PETER HAYNES, WILLIAM STEWART, NANCY STEWART, NELSON B. TURNER, JACOB GALLASPIE, PETER BRYSON, BENJAMIN PARRISH, WILLIAM JOHNSON, REUBEN D. BROWN, THOMAS SAUNDERS, RICHARD WINN, THOMAS STONE, BEVERLY HEAD, DAVID CHENAULT, W. W. WEATHERHEAD, JOHN WEATHERHEAD, GEORGE T. BROWN, B. F. SHARP, AND FRANCIS ROGAN.

Where a will contained the following expressions: "my estate to be equally divided amongst my children," and also, "my lands and slaves to be equally divided amongst my children"; and had in it also the following clause: " to each of my daughters a small tract of land," — the last clause must be rejected as void and inoperative, and cannot be used for the purpose of showing such an ambiguity as would let in extrinsic testimony to explain the intentions of the testator.

When such testimony is introduced, it must be of facts unconnected with any general declaration or wishes expressed by a testator for the disposition of his property. In the present case, the testimony offered purported to express those wishes, and was therefore inadmissible.

Where the Circuit Court instructed the jury that they might consider the acts of one of the daughters and her husband, in acquiescing in a partition, and in receiving "a small tract of land," as a recognition of the true construction of the will to be, that the daughters were not entitled to an equal share, the acts of partition being accompanied by long adverse possession, say thirty or forty years, this instruction was erroneous. The daughter was a minor when she married, and continued covert until within a short time before she brought the suit. No presumption, arising from her acts, could therefore be made against her.

And a recognition by her, when freed from coverture, of a sale which she had made in conjunction with her husband, amounted to no more than a ratification of that particular sale.

So, also, an instruction was erroneous, that the jury might presume from the evidence that there had been a legal partition of the testator's land in respect to his daughters, by order of a court, when the executor assigned to them certain parts of it. By the laws of the State where the lands were, such a partition was a judicial act, and became a record.

28 *

The doctrine of presumption as to records, or proving their existence *aliunde*, explained.

In the present case, the proof is that the partition was not made by the order of a court.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the Middle District of Tennessee.

The whole evidence given upon the trial in the Circuit Court was incorporated into the bill of exceptions, which must be inserted in this statement, and the preliminary narrative must therefore be brief.

On the 20th of July, 1788, Anthony Bledsoe was killed by the Indians under circumstances which are minutely detailed in the evidence. The will which was executed by him, whilst in great bodily suffering and surrounded by an alarmed family, was as follows : —.

" In the name of God, amen.

" Being near to death, I make my will as follows : I desire my lands at Kentucky to be sold, likewise my land on Holston, at the discretion of my executors ; my children to be educated in the best manner my estate will permit ; my estate to be equally divided amongst my children ; to each of my daughters a small tract of land ; my wife to keep possession of the four oldest negroes for the maintenance of the family ; my lands and slaves to be equally divided among my children. I appoint my brother, Isaac Bledsoe, and Colonel Daniel Smith, executors, with my wife, Mary Bledsoe, executrix. At the decease of my wife, the four above negroes to be equally divided among my children
                                    " ANTHONY BLEDSOE. [SEAL.]

" Signed, sealed, and delivered in the presence of us, this 20th of July, 1788.
                                    "JAMES CLENDENING,
                                      THOMAS MURRAY,
                                      HUGH ROGAN.

" *State of North Carolina.* — *Sumner County Court, October Term,* 1788.

" The last will and testament of Anthony Bledsoe, deceased, was produced in open court, and proved by the oath of Thomas Murray and Hugh Rogan, subscribing witnesses thereto. Recorded and examined October 18, 1788."

At this time Bledsoe had ten children, viz. five sons and five daughters. After his death a posthumous daughter was born. Polly, who afterwards married Weatherhead, and was the plaintiff in error, was the eighth child.

In 1793, the executor and executrix (and after the death of

the executor, the executrix alone) conveyed to three of the daughters each a tract of land, by deeds of which the following is an example : —

" This indenture, made this 3d day of January, A. D. 1793, between Isaac Bledsoe and Mary Parker, executor and executrix of Anthony Bledsoe, deceased, of Sumner County, and territory of the United States, south of the river Ohio, of the one part, and David Shelby, of the county and territory aforesaid, of the other part, witnesseth : That they, said Isaac Bledsoe and Mary Parker, pursuant to the last will and testament of the said decedent, hath given and granted, aliened, enfeoffed, and confirmed, and by these presents doth give, grant, alien, enfeoff, and confirm, unto the said David Shelby, all that tract or parcel of land situate in the county aforesaid," &c., &c., containing 320 acres of land more or less.

In 1796 the records of the District Court of Mero District, on the equity side thereof, were burned and destroyed. This court had jurisdiction of the partition and division of estates and other matters in equity in the county of Sumner, where the lands were situated, from the time of making the will until the destruction took place.

In 1799 Polly, being then a minor, married Weatherhead, and immediately thereafter took possession of the 320 acres which were assigned to her.

On the 5th of January, 1801, the residue of the land which remained after giving the daughters 320 acres each was divided amongst the sons, by commissioners appointed by an order of Sumner County Court.

On the 19th of August, 1818, Polly Weatherhead and her husband sold to her brother, Henry R. Bledsoe, the tract of land which had been assigned to her, and shortly afterwards removed to Mississippi.

In 1843 Mr. Weatherhead died.

In October, 1846, Polly Weatherhead brought an action of ejectment in the Circuit Court of the United States for the Middle District of Tennessee, against the persons named in the titling of this report, for the whole tract of 6,280 acres. The defendants appeared, confessed lease, entry, and ouster, and at March term, 1847, the cause came on for trial. Under the charge of the court, which is set out in the bill of exceptions, the jury found a verdict for the defendants.

The following is the bill of exceptions.

" POLLY WEATHERHEAD's LESSEE v. WILLIAM BASKERVILLE
                    AND OTHERS.

" This cause came on to be tried before the honorable John

Catron and Morgan W. Brown, judges, and a jury; when, to maintain the issue on her part, the plaintiff introduced in evidence and read a grant to Anthony Bledsoe, for 6,280 acres of land, from the State of North Carolina, described as is stated in the declaration, and proved that she was one of the eleven children of Anthony Bledsoe, deceased, who died in 1788. She then offered to read a copy of the will of Anthony Bledsoe, from the records of the County Court of Sumner County, to the reading of which copy the defendants excepted, but the court admitted the copy as proper *primâ facie* evidence for plaintiff.

" And suggesting fraud and mistake in the drawing and obtaining the will, and irregularity in the executing or attestation thereof, and insisted that the original will should be produced in court, and the said original will was produced accordingly ; a copy of which, with the probate thereon, is hereunto annexed, marked A, and made a part of this bill of exceptions.

" In admitting General Hall's evidence, he stated what Isaac Bledsoe and his wife had told him was the true will of Anthony Bledsoe. That is, in substance, that each of the testator's daughters shall have a small tract of land, and that on his (General Hall's) repeating the statements of Isaac Bledsoe and his wife to Rogan, he said that the statement made to General Hall was about what had occurred in substance. Rogan having proved the will in the Sumner County Court in 1788, as a subscribing witness thereto, the court held that the will, according to the State laws of North Carolina, was *primâ facie* established, and that a copy might be read by the plaintiff, and which was read accordingly. The court also held, that, to make Rogan's proof valid, it must be presumed by the court and jury that Rogan proved all the necessary facts to constitute a good will to pass lands, the same as if Rogan then had proved the same facts before the jury. But that evidence might be let in on the trial to contradict what Rogan was presumed to have proved in 1788, before the Sumner County Court, when the will was there recorded. It was proved that Rogan had been dead for many years, and that the other subscribing witnesses were also dead. The copy was offered and admitted, and General Hall's evidence in opposition to the validity of the will adjudged to be proper, and heard to the extent above stated, in the progress of the trial, and one day before the original will was produced, on a *subpœna duces tecum*, issued on the part of the defendants to the officer having the same in his custody.

The defendants, except the two Stuarts, were proved to have been in possession at the time of bringing this suit. To the

reading of the original paper writing called the will, or so much thereof as contains the devise of the lands equally among his children, the defendants objected, and the plaintiff then proved the handwriting of Anthony Bledsoe and of the three subscribing witnesses, and that they were dead. It was also proved by the plaintiff that none of the sons of A. Bledsoe had taken possession of the Greenfield land until after the marriage of plaintiff.

### " Mrs. Shelby's Evidence:

" It was proved by Mrs. Shelby, that her sister (the plaintiff) had always complained about not getting an equal share of all the lands of her father under the will, and that she returned from Alabama or Mississippi several times, and tried to have suit brought for it.

### " Dr. Shelby's Evidence.

" It was proved by Dr. Shelby, that James Weatherhead had come into this country several times about this business, and claimed his wife's eleventh part of the land. There was no proof that this claim of wife or husband came to the knowledge of defendants, or those under whom they claim.

### " Malone's Evidence.

" It was proved by William Malone, that, about fifteen years ago, a contract was made by the plaintiff, or her husband, with an attorney, to bring suit in this case, but being unable to give security for a fee of $ 600 then agreed upon, the suit was not brought and the thing failed; they came to this State several other times on this business, but could never get the suit commenced. It was also proved that James Weatherhead, the husband of the plaintiff, was an honest man, of good common sense, but deficient in energy and resolution. He was a ' good, easy man,' and died insolvent.

### " Hall's Evidence.

" General William Hall was introduced by the plaintiff. He proved the boundaries of the grant, dated      day of       , 1787; that he surveyed the land called for in the grant; the number of acres called for in the grant is 6,280, but it held out 250 acres more; that all the defendants were in the possession of the land called for in this grant at the commencement of this action, except the two Stuarts; that the plaintiff, Polly Weatherhead, was a daughter of Colonel Anthony Bledsoe; he thinks in the fall of the year 1799 she intermarried with James Weatherhead, she then being under the age of twenty-one

years. Being cross-examined by defendants, states that he was well acquainted with Colonel A. Bledsoe, who was killed by the Indians in 1788; that his house stood within about six feet of the house of Colonel Isaac Bledsoe at the time A. Bledsoe was killed by the Indians; Ant. Bledsoe had a fort upon the Greenfield grant; Isaac Bledsoe at Bledsoe's Lick; the Indians had become very troublesome, and Ant. Bledsoe had broke up his fort, and moved into the fort of Colonel Isaac Bledsoe. Upon the night of the 20th of July, 1788, about the hour of midnight, the Indians approached the house of Isaac Bledsoe, and lay in ambuscade about forty yards in front of the passage dividing the house, and, with a view of drawing out those in the house, caused a portion of the Indians to ride through a lane rapidly by the house; upon which Anthony Bledsoe and his servant man, Campbell, arose, and walked into the passage, when A. Bledsoe and Campbell were both shot down. Colonel A. Bledsoe was shot with a large ball, which struck within a half inch of his navel, and passed straight through his body, coming out at his back; and from the great pain and rack of misery he suffered from the time he was shot till his death, he was satisfied his intestines were torn to pieces; he died at sunrise the next morning.

" The witness states that the firing of the Indians aroused him to his gun. He heard great lamentations in the house of Colonel A. Bledsoe, and he went down to the fort yard to ascertain who was shot; he was informed that Colonel A. Bledsoe and Campbell were mortally wounded, and some said that preparations were being made for writing his will. He, on consultation with others, concluded to put himself in a condition to resist an anticipated attack from the Indians, and returned to their portholes awaiting the attack, and there remained until about the break of day, when he went into the room where Colonel A. Bledsoe lay; he died about one hour afterwards; he did not hear Colonel A. Bledsoe speak on the subject of the will; he understood that he had made his will. Shortly after the burial of Colonel A. Bledsoe, he was still living in the fort with Colonel Isaac Bledsoe; he conversed with Isaac Bledsoe and his wife, Caty, on the subject of the will, and they both informed him that, shortly after Colonel A. Bledsoe was shot, they knew from the character of the wound that he must shortly die; Caty went to her husband, Isaac Bledsoe, and told him he must see his brother, and suggest to him that he must die, and that some provision should be made for his daughters; for if he should die without a will they would get no land, and the chief of his estate consisted in lands; that this suggestion was immediately made to Anthony Bledsoe by Caty Bledsoe,

in the presence of Isaac Bledsoe; and Anthony Bledsoe said to his brother, that, if he would get pen and ink, he would make his will; Isaac Bledsoe said he stepped to the passage and called Clendening from the other room, and he told Clendening that he must come and write his brother's will; that he himself was so confused and agitated that he could not write it himself; they got a table and placed it near him, and while Clendening was writing the caption of the will, Anthony Bledsoe observed to Isaac Bledsoe that he wanted him and Colonel Daniel Smith and his wife to act as executors and executrix of his will, as he intended to leave considerable discretion with him in carrying out his will; Anthony Bledsoe was suffering great pain, and Caty Bledsoe got up behind him in the bed, and supported him till the will was finished. Isaac Bledsoe said to Colonel A. Bledsoe, Mr. Clendening is ready to write your will, how do you want your property disposed of? And Bledsoe stated to Clendening, that he wanted to leave a small tract of land to each of his daughters, at the discretion of his executors, and the balance of his lands to his sons, except his land on Holston and in Kentucky, and them he wished to be sold to raise and educate his children; and the balance of his property to be equally divided between all his children, except the four oldest negroes, and them he wished to remain with his wife till her death, and then to be equally divided among his children. He shortly after saw Hugh Rogan, a subscribing witness to the will, who lived within the fort till 1793, and had a conversation with him in regard to the will of Colonel A. Bledsoe; and detailed to him what Colonel Isaac Bledsoe and wife Caty had told him about the making of the will, the same that is above specified, and that Hugh Rogan then said it was about what A. Bledsoe said on that occasion, in substance. About the time that Isaac Bledsoe was about to lay off the land to the four oldest daughters, witness was present, to wit, in 1793; and witness asked him what he considered would be a small tract of land under the will, when Colonel Isaac Bledsoe observed to him that less than 320 acres would not make a good plantation, and that he intended to give his own daughters 320 acres each; and that he intended to assign to his brother's daughters 320 acres of the best of the land out of the Greenfield survey, and done so. Three of the deeds, marked Nos. 1, 2, 3, and made part of this bill of exceptions, to wit, to David Shelby, William Neely, and James Clendening, who had married three daughters, show the land out of the Greenfield tract assigned them. They immediately took possession of the land, all parties being well pleased. Clendening died on his in the year 1822, when it descended to his children; Neely

and Penny continued in possession of theirs till they sold, and their assignees yet remain in possession. Shelby continued in possession of his till his death, in 1822; Mrs. Sally Shelby sold it, and her assignees continue in possession to this day. Each of the tracts contains about 400 acres.

" General Hall further stated, that the plaintiff, Folly Weatherhead, married James Weatherhead, he thinks, in the fall of the year 1799, and immediately thereafter took possession of their 320 acres assigned them out of the Greenfield grant. She and husband continued in possession till they sold it to her brother, Henry R. Bledsoe. Their deed, of the 19th of August, 1818, is here exhibited, marked No. 5, as part of this bill of exceptions. Shortly afterwards Weatherhead and wife moved to Mississippi. He never heard her or him put up any claim to any other portion of the Greenfield tract, in opposition to the right of the boys, Henry R., Abraham, and Isaac Bledsoe, nor held any talk with her on the subject. The balance of the grant of the Greenfield tract, in January, 1801, was divided among the boys by the commissioners, as appears by the deed here exhibited, marked No. 7, as part of this bill of exceptions. Isaac Bledsoe took possession, for himself and brothers, of this land, before 1801; he thinks in 1799, but would not be certain; whether before or after the marriage of plaintiff, cannot say; he thinks the guardians of the boys and girls rented the Greenfield tract out from 1796, till Isaac Bledsoe took possession himself, but is not certain; that Abraham Bledsoe continued in possession of the land assigned him till his death, about 1816 or 1817; Henry R. Bledsoe of his till his death, in 1822; Isaac Bledsoe of his till he sold to David Chenault, the defendant, and John Patterson. The deeds are here exhibited, all of which is admitted; need not copy them. Since the year 1800, Isaac, Henry R., and Abram Bledsoe, and their assigns, have held the peaceable and adverse possession of said tract of land devised as aforesaid. Previous to the year 1818 there were extensive clearings and improvements upon the land of the boys; many houses erected; and from that period to the present time those clearings have been extended, and some very valuable brick buildings been erected and possessed by some of the defendants. The improvements of this land are extensive, valuable, and permanent, and have been made from the year 1800 up to the present time.

" *The Testimony of General William Hall, continued.*

" The defendants read the deed from Nathaniel Parker and Mary Parker, dated 30th January, 1796, for 640 acres of land,

which lies within the bounds of the Greenfield grant, as proved by the witness, General Hall, who stated that the executor of Anthony Bledsoe made the deed to take up a bond of Anthony Bledsoe to Hugh Rogan. The defendant Francis Rogan lives on the part of the Greenfield grant conveyed to his father, Hugh Rogan, as aforesaid. The defendants then read the bond of A. Bledsoe to Hugh Rogan, dated the 18th of April, 1783, referred to in the testimony of General Hall, exhibit No. 8; need not be copied. The deed is referred to, exhibit No. 9. The defendants read the deed from the executor and executrix of Anthony Bledsoe, to wit, Isaac and Mary Bledsoe, of the 6th of April, 1700, exhibit No. 10, to William Bowman. General Hall proved that he was present when this land was run out; that he saw the bond of Colonel Anthony Bledsoe, which was assigned to William Bowman for this land; and that the executor deeded this land to Bowman in discharge of the covenants of said land, and this land lies within the bounds of the Greenfield grant.

"The defendants read the grant of the State of North Carolina, dated the 27th of June, 1793, for 640 acres, and likewise read the entry of the 14th of February, 1784, upon which the grant was founded, exhibits No. 11 and 12; need not be copied. General Hall proved that the grant of Evan Evans lies within the bounds of the Greenfield grant. The defendants read the deed of release from the plaintiff, and Martha Patterson, the wife of James Patterson, to John Patterson, (said Pattersons married daughters of James Clendening and Betsey Clendening,) dated the 14th of August, 1846. General Hall proved that this release not only embraced the 320 acres assigned the plaintiff, but likewise 335 acres of land, lying within the bounds of the Greenfield grant, which is not sued for. A deed from Henry R. Bledsoe to John Patterson, Jr. was read, exhibit No. 14. General Hall proved that this was the tract assigned to the plaintiff. The record of the County Court of Sumner was read, showing that the guardians of the girls listed the 320 acres of the Greenfield grant from 1794 till their marriage; and the sons of Anthony Bledsoe, by their guardians, listed the balance of the Greenfield grant for the boys. General Hall proved that the taxes were paid accordingly as listed. General Hall proved that the plaintiff had some eight or ten children, the oldest about forty-eight years; some four or five sons-in-law; and that she and husband, on several occasions, have been in the county where the land lay, since their removal from the county, as before stated. General Hall proved the handwriting of Anthony Bledsoe to the original will; and likewise the handwriting of the three subscribing witnesses;

and that the said Rogan and Clendening were men of the very highest character for integrity and truth. The deposition of Mrs. Desha, which is to be copied as part of this bill of exceptions, was read by the defendants.

" The plaintiff's counsel objected to that part of General Hall's testimony in which he details what he may have heard Isaac and Caty Bledsoe and Hugh Rogan say in relation to the circumstances that attended the making of the will, on the ground that it was hearsay. But the court allowed it to go to the jury, to which the plaintiff excepts. The plaintiff objected to all the testimony tending to prove any thing, or state of facts contrary to the written will, or to show that any thing was omitted or inserted in the will through mistake.

## " *Mrs. Read's Evidence.*

" The defendants introduced Mary Read. She proved that she was well acquainted with Colonel Anthony Bledsoe; he was her uncle. In the year 1788, her father, Isaac Bledsoe, was living in the fort near Bledsoe's Lick; it was very troublesome times with the Indians. Colonel Anthony Bledsoe had left the Greenfield tract, and was living in one end of my father's house. About midnight of the 20th of July, 1788, after the families had retired to bed, James Clendening announced that he had discovered some Indians near the houses. Colonel Anthony Bledsoe got up and went into the passage with Campbell, it being a clear moonlight night, when Campbell was killed dead, and Colonel Anthony Bledsoe mortally wounded by a shot from the Indians, the ball having passed directly through his body. I was in the house of Isaac Bledsoe, my father, at the time; there was difficulty in getting light; at length Hugh Rogan went to the kitchen and got fire; immediately after, Anthony Bledsoe was shot; he was drawn into the house, having fallen from the shot; when the light came, his wound was examined and discovered to be mortal; he was in extreme agony; no mortal could have suffered more; his intestines were shot and torn; and what is called his caul fat came out to a considerable length; he continued to suffer immensely till his death, which occurred about sun up next morning; there was great confusion in the room, great lamentation and grief among the family, and those present; with all, a momentary attack was expected from the Indians till day. Shortly after the light came, Anthony Bledsoe asked my mother, Caty Bledsoe, what she thought of his case. She told him he must inevitably die, and that he ought to make preparation for another world; he seemed to have a great deal of concern about that; after a little, my mother suggested to

him that four of his oldest children were girls, and if he died without a will his girls would get none of his lands, and the chief of his estate consisted in lands; and suggested the idea of his making a will, in order to make some provision for his daughters; he seemed to hesitate, and said he did not know who they would marry, but said in the presence of my father and mother, and others, that, if they would have it wrote, he would make a wii

" I distinctly recollect, that he said that he wanted his Kentucky and Holston land sold, and the proceeds applied to the education of his children; that he wanted a small tract of land given to his daughters, at the discretion of his executors; the balance of his lands to be equally divided among his sons; that the four oldest negroes to be kept by his wife during her life, and the balance of the property to be equally divided among all his children. James Clendening approached a table near where he lay, and commenced writing the will. I did not hear what he said when the will was writing, if he said any thing. I was present all the time, from the time the will was first suggested to him to the time of his signing his will; heard him make no other disposition of his estate, but that which is detailed above. My mother got behind Anthony Bledsoe, and held him up with her knees; he talked but little, was in extreme agony all the time; when he talked, he talked sensibly up to his death. I do not know whether the will was read over to him or not; he signed his name to it. My father, Isaac Bledsoe, was standing by him when my mother suggested to him the propriety of making the will; was present during the whole time of the writing of the will, and was over him when he died. I was about ten years of age at that time; the occurrences of that night made a deep and lasting impression on my mind; I recollect what was said and done more distinctly than transactions of late date, and this has been impressed upon my mind by conversations with others since. James Clendening, the drawer of the will, shortly afterwards married one of the daughters of Colonel Anthony Bledsoe; he and Hugh Rogan resided in my father's fort some four or five years afterwards; my father was appointed an executor with the widow, previous to his being killed by the Indians; in 1793, pursuant to the request and will of my uncle, he assigned to David Shelby, who had married Sally, the oldest daughter, a small tract of land, the boundaries of which contain about four hundred acres, as appears by the deed; the other three daughters, to wit, Betsy, who married James Clendening, Rachel, who had married William Neely, Susan, who had married William Penny, received and had assigned to them their por-

tions, as appears by their respective deeds signed by the executors in the year 1793, containing 400 acres of land, all of which was taken out of the Greenfield survey, covered by the grant of 1787, exhibited by the plaintiff in the cause. In addition to these four children, Colonel Anthony Bledsoe at his death had the following: Thomas and Anthony, both of whom, under age, were killed by the Indians in the year 1794; Anthony in April, and Thomas in October, 1794; Isaac, Polly, Abram, Henry, and Prudence, who was born after the death of her father, being eleven in number. David Shelby, James Clendening, William Neely, William Penny, Joseph Sewell, and James Weatherhead all married daughters of Colonel Anthony Bledsoe, and were smart business men, and some of them married fifty or sixty years ago. James Weatherhead married the plaintiff, Polly, she thinks in the fall of 1799, and the next year took possession of the 320 acres laid off to her out of the Greenfield tract, and continued in possession for many years, till they sold to Henry R. Bledsoe, her brother, as appears by their deed of the 19th of August, 1818, which is exhibited, marked No. 5. Sewell and his wife Prudence got a like portion of land assigned them, from the southeast corner of the grant; all of which portions they possessed and enjoyed till they were all sold, except Clendening's lot, which descended to his heirs. Clendening died in 1822; Isaac Bledsoe took possession of the balance of the Greenfield tract for himself and brothers about the year 1800, she is not positive whether it was before or after, and that portion was divided between them, as appears by the report of the commissioners in 1801.

## " *Parker's Evidence.*

" Nathaniel Parker, a witness for defendants, proved that he has always resided near the Greenfield tract of land since the year 1796. That Isaac, Henry R., and Abram Bledsoe, and the defendants claiming under them, have had the possession of the lands sued for since the year 1799 or 1800, cultivating and improving the lands, building houses, &c., since that period. That James Weatherhead married the plaintiff in the fall of 1799. That they took possession of the 320 acres of land assigned the plaintiff, he thinks in the year 1800; that they were close neighbors of his; was intimate with them; James Weatherhead worked on his house; Penny, who married a daughter of Colonel Anthony Bledsoe, was his brother-in-law; he was well acqainted with Joseph Sewell, James Clendening, David Shelby, and William Neely, who married likewise daughters. They were all smart men. Weatherhead was an

Weatherhead's Lessee *v*. Baskerville et al.

acting justice of the peace for Sumner County for many years; David Shelby was the guardian of Polly Bledsoe, the plaintiff, and was the clerk of the County Court of Sumner for some thirty years, and pursued his own interest closely. That during all this intercourse and acquaintance, he never heard any claim on their part upon any portion of the Greenfield tract assigned the boys.

### " Carr's Evidence.

"John Carr, a witness for defendants, proved the same facts in substance proved by Nathaniel Parker.

"It was proved by competent testimony, which the plaintiff does not require to be copied into this bill of exceptions, that a division was made of the residue of the Greenfield survey after taking out the shares assigned the daughters, the land conveyed to Rogan and Bowman, and the land covered by the Evan Evans grant, between the three remaining sons of Anthony Bledsoe, by partition in a court of record, and that possession was continued under this division, and the deeds made under it, till the bringing of this suit, there being a regular chain of title from said partition, which was made in 1801.

"It was further proved, that possession had been taken by said sons jointly in the year 1800, adversely. The plaintiff and her husband having in that year also taken possession of the 320 acres laid off to them by the commissioners, no written evidence of which was adduced.

### " McGavock and Hickman's Evidence.

"It was proved by Jacob McGavock and Thomas Hickman, that the records of the District Court of Mero District on the equity side thereof were burned and destroyed in the year 1796; and it appeared by competent proof, that this was the court having jurisdiction of the partition and division of estates and other matters in equity in the county of Sumner, where the land in controversy lies, from the time of the making of the will to the date of the destruction aforesaid.

"It is admitted that the land in controversy exceeded the sum or value of two thousand dollars.

### " Charge of Court.

"Whereupon the court charged the jury as follows:—

"We are first of opinion, that parol evidence may be heard to the following extent, in reference to the devises in the will of Anthony Bledsoe: The clause, 'to each of my daughters a small tract of land,' we regard as directly conflicting with the clause, 'my lands and slaves to be equally divided amongst

29*

my children.' It is contended by the plaintiffs, that by these devises the daughters not only take equally with the sons the lands of the testator, but that an additional small tract is also given to each daughter. From the then state of the law of descents, which excluded the daughters, and from the number and circumstances of the testator's family and estates, we think this construction of the conflicting clauses cannot be adopted; but that the clause which gives to each of the daughters a small tract of land must be regarded as unmeaning and useless. That it stands in conflict with an equal division is undeniable. The question then is, whether this inconsistency on the face of the will authorizes proof extrinsic of the recorded paper, to show that it was the intention and will of Colonel Bledsoe to give the daughters each a small tract of land only, and not an equal share, as contended by the defendants. The distinct question for the jury to try is, whether Anthony Bledsoe's will was, that his daughters should each have a small tract of land and no more. To find this to be the true will, the jury must find that the clause, 'my lands to be equally divided amongst my children,' was not Anthony Bledsoe's will, but inserted without his instruction or knowledge, and contrary to his intention, wish, and will.

" A paper writing, purporting to be a man's will or deed, executed and proved according to the forms of law, shall always be deemed such, unless positive proof of the contrary is made out clearly. In the case of a devise, it must be shown that the testator's will and intention was different at the time of making the instrument, and that that will and intention was not embodied in the writing, either by fraud or mistake at the time; or, in other words, that that which he positively willed was wrongfully set down, either designedly, which would be fraud, or not designedly, which would constitute mistake; but both standing upon the same principle in law and in fact, in an issue of *devastavit vel non*; and on these principles the jury will proceed to consider the case.

" The witnesses state that Colonel Bledsoe was shot in July, 1788, on the premises in dispute, where his family resided, and where his wife and children continued to reside for many years thereafter; that he was shot by the Indians through the centre of the body, and his bowels torn to pieces. He was in his own fort, between two log-houses, in a passage, where he received the mortal wound and fell, another (his servant) being killed at the same fire; that he was carried into one of the houses. This was about midnight, and he died after daylight next morning, being in extreme pain, and writhing much all the time after he received the mortal wound up to the time when

he died. During this time Isaac Bledsoe, and especially the wife of Isaac, proposed to their dying brother to make a will; the main intention of which was, to make a provision for his daughters out of his lands, they being cut off by the statute of descents. That at the time there was extreme distress in the house; various women, children, and men in it, and much confusion; that James Clendening (who was in the fort with many others) was sent for (he being on guard) to write the will, and did so, at the bedside of the wounded testator; that the will was executed before daylight. These facts we understand to be undisputed; but whether they are or are not correctly stated the jury will judge, our object being to state only such an outline of the facts as to make the charge to the jury intelligible, as regards the application of the rules of evidence to the case submitted to the jury. They will take into consideration the situation of the testator, and all the circumstances that surrounded him, at the time he was making his will, that is, during the time that Clendening was writing it, all that was said to him after he was shot and before Clendening commenced writing the will, and all that the testator said and did during these times, and all that was said to him after Clendening commenced writing the will and before it was completed, in regard to its contents. The jury will next consider the conjoint acts of Polly Weatherhead and her husband, and the acts of all the other devisees of Anthony Bledsoe, in instances where the whole of the devisees (including said Polly and her husband) are concerned in dividing the estate of the said testator, and see how far they mutually recognized the true will to be, that each of the daughters should have a small tract of land, but not an equal division by the partition they actually did make amongst each other; and especially how far Polly concurred in these acts of partition, and in a mutual occupation of the lands each devisee took. These acts are evidence that is strengthened by the lapse of time, and of long acquiescence on the part of Polly, if the acts of partition were accompanied by long adverse possession, each devisee holding adversely, and for her or himself, the parcel of land partitioned to him or her, say for thirty or forty years, under the partition.

" If the jury find from the evidence that the will of the testator was, that each of the daughters should have a small tract of land and no more, and find that Polly had partitioned to her the 320 acres, out of the south side of the Greenfield tract, as such small tract, then she has no right to recover in this action.

" And as to the fact of a legal and binding partition among the devisees of Anthony Bledsoe, we think, and so instruct the,

jury, that, if they believe the facts given in evidence, then they
would be authorized to presume that a legal partition had been
made, the evidences of which had been lost by the accidents of
time, and that Polly Weatherhead had legally received her
share of the lands of the testator. In regard to the statute of
limitations, the jury is instructed that, if Polly Weatherhead,
by her guardian, had a joint possession of the land in dispute
with her brothers, all claiming as tenants in common, and that
such joint possession continued up to the time of Polly's mar-
riage with James Weatherhead, then the act of limitation has
not barred her right of recovery, if she sued within three years
after her husband's death.

"The jury is further instructed, that, if they find for the plain-
tiff, they must find for one eleventh part of so much of the land
sued for as was partitioned to the brothers of Mrs. Weather-
head, unless the plaintiff has relinquished her right to some
part of the same.

"In regard to that part of General Hall's evidence where he
deposed as to what Isaac Bledsoe and his wife told him respect-
ing the intention of the testator, and which statements of Isaac
Bledsoe and his wife General Hall repeated to Hugh Rogan, the
subscribing witness to the will, and who (with Thomas Murray,
another subscribing witness) proved the will in the ordinary
form in 1788, and which statement was affirmed by Rogan to
be substantially accurate, the jury will consider the evidence as
intended only to impair the proof of Rogan in so far as the al-
leged mistake in the will is assumed to exist; but General Hall's
evidence being competent, the jury may ascertain how far it
comes in support of Mrs. Read's statement, and the acts of the
plaintiff and her husband, in affirmance of the mistake alleged
to have been made by Clendening in drawing the will, if such
acts there be. To which charge, the plaintiff, by her counsel,
excepted.

"The jury then rendered a verdict for the defendants; and
the plaintiff then moved the court for a new trial, which was
refused. To all which decisions of the court, in the admissions
of the evidence excepted to, and the charge of the court to
the jury, and the refusing a new trial, the plaintiff excepts, and
prays his bill of exceptions to be signed, sealed, and made a
part of the record, which is done accordingly.

"J. CATRON,
M. W. BROWN."

Upon this bill of exceptions the case came up to this court.

It was argued by *Mr. Meigs*, for the plaintiff in error, and
*Mr. Fogg*, for the defendants in error.

*Mr. Meigs,* for the plaintiff in error.

The lessor of the plaintiff, Polly Weatherhead, being one of the children of Anthony Bledsoe, the patentee of the land in dispute, claims title to an undivided eleventh part of it, under his will, which is in the following words: —

" In the name of God, amen. Being near to death, I make my will as follows:

" 1. I desire my lands in Kentucky to be sold; likewise my lands on Holston, at the discretion of my executors.

" 2. My children to be educated in the best manner my estate will permit.

" 3. My estate to be equally divided among my children.

" 4. To each of my daughters a small tract of land.

" 5. My wife to keep possession of the four oldest negroes for the maintenance of the family.

" 6. My lands and slaves to be equally divided amongst my children.

" 7. I appoint my brother Isaac Bledsoe and Colonel Daniel Smith executors, with my wife, Mary Bledsoe, executrix.

" 8. At the decease of my wife, the four above negroes to be equally divided amongst my children."

The defendants repel her claim by alleging that the word *children,* in the third and sixth clauses of the will, was inserted instead of the word *sons,* by the mistake of the draughtsman. And out of this the first question arises, viz.: —

1. Whether parol evidence is admissible to prove the error of the draughtsman, and to correct it, either by inserting the word *sons* instead of the word *children,* or by striking out the clauses in which the word *children* is inserted; in which case the lands would pass to the sons by the then law of descents in Tennessee.

For the lessor of the plaintiff, we insist that this evidence was erroneously admitted by the Circuit Court. And in support of this position, out of the numberless cases in the books, we shall cite only three, one of them having the merit of being directly in point; namely, Weatherhead *v.* Sewell, 9 Humphreys, 272, 303, decided by the Supreme Court of Tennessee, at December term, 1848, upon this very will; and the other two, Newburgh *v.* Newburgh, 5 Madd. 364, and Miller *v.* Travers, 8 Bingh. 244, both being closely analogous to our case. For a classification of all the cases, see Wigram on Wills, a treatise approved by the highest authority in England; Doe d. Gord *v.* Needs, 2 Mees. & Wels. 129; 1 Spence's Eq. 554; Sugden on Property, ch. 2, § 1, arts. 4, 5, 9, 17; and America, 1 Greenleaf's Ev. §§ 287, 291, and notes.

Besides admitting the testimony of witnesses to alter the

will, the Circuit Court charged the jury to consider the conjoint acts of the plaintiff and her husband, and the acts of the other children, in instances where they all concurred in dividing the estate; and, from the partition they actually did make amongst each other, see, —

1st How far they mutually recognized the true will to be, that each of the daughters should have a small tract of land, but not an equal division; and

2d. Especially, how far the plaintiff concurred in these acts of partition, and in the mutual occupation of the lands each devisee took.

The jury were then told, that these acts of the plaintiff in recognition of the partition actually made, and of concurrence and long acquiescence therein, and in the possession held accordingly, were evidence strengthened by lapse of time, that the will was, that each of the daughters should have a small tract of land.

This is but to say, that we are to learn what a will is, not from the face of it, but by the glosses put upon it by contemporaries, and that we may gather those glosses from circumstantial evidence, as well as from the direct swearing of witnesses.

2. The court next instructed the jury, that, if they believed the facts given in evidence, then they would be authorized to presume that a legal partition had been made, the evidence of which had been lost by the accidents of time; by which partition the plaintiff legally received her share of the testator's land.

Here I take the meaning of the court to be, that, supposing the will to give her one eleventh part of the land, the jury may presume, from the facts in evidence, that a partition was legally made, assigning the plaintiff such part.

Be it so, for the sake of argument; then the defendants are in the adverse possession of her share in severalty, and are not tenants in common with her; and unless they are protected by the statute of limitations, or by lapse of time, she must recover.

But they are not protected by the statute of limitations, because the evidence shows that the adverse possession did not commence till after her marriage, she and her brothers having held in common till that event.

Are they protected by lapse of time? They are, if conveyances can be presumed from her to the defendants.

" But no case can be put in which such a presumption has been made, except where a title has been shown by the party who calls for the presumption, good in substance, but wanting some collateral matter necessary to make it complete in point

of form. In such cases, when the possession is shown to have been consistent with the existence of the fact directed to be presumed, and in such cases only, has it ever been allowed." Per Tindal, C. J., in Doe d. Hammond *v.* Cooke, 6 Bingham, 174; 1 Greenleaf's Ev. § 46.

In Doe d. Fenwick *v.* Reed, 5 Barnwell and Alderson, 232, it appeared that, in 1752, an ancestor of the defendant had been put in possession of the land in question as a creditor under a judgment against the then owner, which possession continued in the defendant and his family down to the time of trial, in 1821, being sixty-nine years. It appeared also that the title-deeds, which, however, also related to other lands, had continued in the possession of the plaintiff's family, and that moduses had been paid by them for several estates, including some of the property in question.

On this evidence, Bayley, J. told the jury, that the real question for them to consider was, whether they believed that a conveyance to the defendant, or those under whom he claimed, had actually taken place; observing that the loss of a deed was less likely to take place than of a grant of a right of way; and that, during a portion of the period of the possession, two of the parties under whom the plaintiff claimed being married, no conveyance could have been made without levying a fine, which, being of record, might have been produced if it had existed.

The jury having found for the plaintiff, on motion for a new trial, the whole Court of Queen's Bench concurred in refusing the rule. Abbott, C. J., in delivering the judgment, said: —

" I am clearly of opinion, that the direction was according to law. In cases where the original possession cannot be accounted for, and would be unlawful, unless there had been a grant, the rule may, perhaps, be different. Here the original possession is accounted for, and is consistent with the fact of there having been no conveyance.

" It may, indeed, have continued longer than is consistent with the original condition; but it was surely a question for the jury to say whether that continuance was to be attributed to a want of care and attention on the part of the family under whom the plaintiff claims, or to the fact of there having been a conveyance of the estate. As the defendant's ancestor had originally a lawful possession, I think it was incumbent on him to give stronger evidence to warrant the jury in coming to a conclusion that there had been a conveyance.

" As to the judge's observations respecting the fine, I think he might properly tell the jury, that, under the circumstances, they would probably find a fine.

" In my opinion, presumption of grants and conveyances has already gone too great lengths, and I am not disposed to extend it further."

Again, in the case of Doe d. Howson v. Waterton, 3 Barn. & Ald. 149, where copyhold premises were surrendered to a charitable use in 1743, but it did not appear that the provisions of 9 Geo. II. c. 36, with respect to the enrolment of conveyances to charitable uses, had been complied with, it was held, in 1819, that is, after the lapse of seventy-six years, that the existence of a bargain and sale, and enrolment under the statute, could not be presumed from the possession since 1743. Lord Tenterden, C. J., there says : —

" It is said, in this case, that the court may presume, if necessary, that a bargain and sale and enrolment have been made. But no instance can be found where the courts have presumed that an enrolment had been made. I am of opinion, that no presumption ought to be made."

And Bayley, J., adds : " As to presuming an enrolment, if it had appeared that the rolls of Chancery had been searched, and a chasm had been discovered about the period of the surrender, it might have been sufficient. At present there is no evidence upon which such presumption can be founded."

Now for the application of these cases. According to C. J. Tindal's rule, no partition can be presumed in this case, because the defendants have not shown " a title good in substance, but wanting some collateral matter necessary to make it complete in point of form." The title shown by them is good in substance and form, being conveyances from the plaintiff's brothers. If the defendants had shown a good deed in substance from plaintiff's husband, signed by her, but wanting privy examination, or words of grant or release on her part, as in Melvin v. The Proprietors of the Locks and Canals on Merrimack River, 17 Pick. 255, 262, this collateral matter, necessary to make the deed complete in point of form, might have been supplied by presumption. Had the defendants produced such a substantially good, but formally defective deed, their possession would have been consistent with the existence of the fact to be presumed, and then the presumption is allowable, according to the other branch of C. J. Tindal's rule.

Further : A partition in Tennessee may be made by mutual conveyances where the parties are adult and can agree, or where they are minors or cannot agree, by bill in chancery, or by the summary method prescribed by the act of 1787, c. 17.

Supposing the first method to have been adopted in this case, the execution of the deed by the husband must have been proved by two witnesses, or acknowledged by him before the

County or Circuit Court of Sumner County, and acknowledged by the plaintiff on privy examination by the court, and minutes of the probate or acknowledgment and privy examination entered on the record, a certificate of this indorsed on the deed by the clerk, and then the whole recorded in the registry of deeds for the county.

Are we to presume, in the absence of evidence, that search has been made in vain for traces of these records; that no such records exist; and supply the whole, at a blow, by a presumption? If so, what ought the instruction to the jury to have been? According to the case of Doe d. Fenwick v. Reed, the court should have said to the jury : —

" The real question for you to consider is, whether you believe that a partition, by mutual deeds between the devisees, actually did take place ; and, as this could not be without record of the proof, or acknowledgment of the deed and privy examination of the wife, some traces of which records probably exist, you should not presume the deed in the absence of evidence that such traces are not to be found. And the court is of this opinion, because the original possession of the defendants can be accounted for in this case without making the presumption in question, and was lawful, though no such partition was made."

If a partition by mutual conveyances ought not to be presumed in such circumstances, much less ought a partition by bill in equity, or by the summary proceeding prescribed by the statute, to be presumed. In the absence of the evidence of a search, without success, for any of those records, it is impossible to presume them. 3 Barn. & Ald. 149; Best on Presumptions of Law and Fact, §§ 39, 40, in 37 Law Lib. 47, 49.

But in this case the adverse possession commenced after the plaintiff's coverture. Now, in McCorry v. King's Heirs, 3 Humphreys, 267, 278, it appeared that George Gillespie, the grantee of the lands in question, on the 14th of December, 1793, devised in his will as follows : " I give and bequeathe to my well-beloved daughter, Jane Gillespie, her heirs and assigns for ever, the tract of land I bought of James and Charles McCartney, lying in Green County." After the death of the devisor, Jane, the devisee, married William King, by whom she had children, the lessors of the plaintiff. In 1803 King, without his wife in any manner joining him therein, conveyed to Hayworth the land sued for. In 1804 Hayworth conveyed to Copeland, and he in 1809 to McCorry, the defendant. Jane King, the devisee, died in January, 1828, and William King, her husband, in October, 1835, and on the 4th of February, 1837, the children of Jane and William King commenced an

ejectment against McCorry to recover the lands which he had possessed under the deed made by their father for thirty-four years. Upon this state of facts the court say : —

" It is insisted that the jury should have been instructed that they might presume, from the length of possession in this case, that the wife had properly conveyed; that her ancestor, the testator, had made a deed, or the State issued an older grant to the defendant, or to those under whom he claims. We are of opinion, that the judge of the Circuit Court, presiding at the trial, very properly withheld such instruction.

" When the circumstances of the case, the relation of the parties towards each other, or the condition of the title, obviate and repel the bar of the statute, we think it would be wrong in principle, and unsupported by precedent, to protect the possession by giving effect to the doctrine of presumption insisted on. It would operate, moreover, most unjustly. A tenant in dower might alien in fee, and live for sixty or seventy years afterwards. The heir could not enter or sue during her life, and the statute would not operate in favor of the alienee until seven years had elapsed after the death of the tenant in dower. Yet, if the doctrine of presumption was applied to the case, the alienee would have a good title in fee, not by the deed he had taken, but by another presumed in his favor for more than twenty years before the death of the doweress. The truth is, the doctrine of presumption, as well as the bar created by the policy of the statute, is founded upon the principle of laches in him who, having the right, power, and capacity to sue, and disturb, or recover possession, for a long time omits and neglects to do so.

" This doctrine, under such circumstances, to secure the repose of society, presumes, at length, that he who could and would not sue had parted with his right. But to presume against him who is unable to sue, whose right of action has not accrued, who has been guilty of no laches, that his title has passed from him, or from those under whom he claims, would be an application of the doctrine of presumption as novel, we think, as it would be mischievous. The husband sells the land of the wife, and conveys in fee; the coverture continues for fifty years afterwards; the wife survives; she is within the saving of the statute; she brings her suit, and is told that the title has long since been lost by the presumption of a valid conveyance from her. Certainly this could not be tolerated."

So the Supreme Court of New Hampshire, after remarking that the doctrine of presuming a deed, from long possession and acquiescence, has been established, in analogy to the pro-

visions of the statute of limitations, proceed to say, that, where a husband undertakes to convey land in fee, of which he is seized only in right of his wife, in such a case no presumption of a grant can be raised against the wife by her acquiescence during coverture, because she is not in a situation, and has no power, to interfere and avoid the act of her husband; and if she could, it might be his interest to prevent her. 4 N. Hamp. 327, 328, in the case of Barnard v. Edwards.

So in the case of the Lessee of Margaret Delancey v. McKeen, 1 Wash. C. C. 354, the lessor of the plaintiff, having survived her husband, sued for one hundred acres of land, part of a tract of one thousand acres that had been conveyed to her and her husband in 1771, by William Allen, her father. The defendant set up a title under a deed from the commissioners of forfeited estates, who sold the same as part of the estate of Andrew Allen, a son of William Allen, and brother of the plaintiff, he having been regularly attainted. His estates were sold in 1778, and the deed executed in 1779. The defendant proved that, in 1775, Andrew Allen entered into contracts for the sale of parcels of this land; that he offered the whole tract, including the one hundred acres sued for by plaintiff, for sale; that he received the consideration money for such parcels as he had sold; that these payments were made, sometimes to himself, sometimes to William Allen for his use; that, at one time, the plaintiff was in the room when a sum for part of the land was paid by the purchaser.

For the defendant it was urged, that these acts of ownership by Andrew Allen were sufficient to authorize the jury to presume a conveyance from Delancey and the plaintiff, his wife, to Andrew Allen, or, at any rate, an agreement to sell, which would be sufficient to pass an equitable estate to Andrew Allen; upon which, as well as upon legal estates, the act of confiscation operated.

To this Judge Washington answered: " The acts of ownership by Andrew Allen, set up as a title for the defendant, prove nothing against the plaintiff, who labored under two disabilities, coverture and absence beyond seas, until the year 1780 or 1781, when the joint estate vested in her by survivorship."

It is true that Judge Story, in Tyler v. Williamson, 4 Mason, 402, does say, that " the presumption is applied as a presumption juris et de jure, whenever by possibility a right may be acquired in any manner known to the law." And he adds; " Its operation has never yet been denied in cases where personal disabilities of particular proprietors might have intervened, such as infancy, coverture, and insanity, and, by the ordinary course of proceeding, grants would not be presumed."

But Angell, in his work on Adverse Enjoyment (p. 116), says: "Persons who labor under a disability, it would seem, are protected against the common effect of the rule under consideration, inasmuch as they are excepted in the statute in analogy to which the rule was established. Besides, as a prescriptive right is founded upon the supposition of a grant, it cannot be opposed to those whom the law does not allow to have the control and administration of their property." And in Watkins *v.* Peck, 13 N. Hamp. 377, the Supreme Court say, "that, notwithstanding the above remark of Judge Story, we are of opinion that no grant can be presumed from an adverse use of an easement in the land of another, for the term of twenty years, where the owner of the land was, at the expiration of the twenty years, and long before, incapable of making a grant, whether the disability arose from infancy or insanity." "Perhaps," they add, "a disability intervening during the lapse of the term, but not extending to the termination of the period of twenty years, might not be sufficient to rebut the presumption; but it would be absurd to presume a grant, where it was clear that no such grant could have existed." The Supreme Court of New York, too, 16 Johns. 214, in Bailey *v.* Jackson, even say, "that this is not like a statute bar, which having once begun to run will continue, notwithstanding a subsequent disability occurs."

Be this as it may, these citations are enough to show that Judge Story's remark is not supported, unless this presumption be, as he says in that place, a presumption *juris et de jure;* or unless, as Lord Mansfield said, 4 Burr. 2023, quiet possession alone, for twenty years, be a "flat answer"; or, as Eyre, C. J., in 1 Bos. & Pul. 400, styled it, à "complete answer, or bar to the action." This is to confound the well-established distinction between conclusive and rebutable presumptions, and to put the latter upon the same footing as prescription and the statute of limitations. Greenleaf's Evidence, § 46. And it is to be observed that Professor Greenleaf cites the case of Tyler *v.* Wilkinson, where he is treating of the title by prescription. Ev. § 17.

Finally, upon this point, inasmuch as presumptions of this kind are in truth but mere arguments, and depend upon their own natural force and efficacy in generating belief or conviction in the mind (Greenleaf's Ev. § 44), the charge should have been, as already suggested, in the words, substantially, of Bayley, J., in Fenwick's Lessee *v.* Reed, to wit: "The real question for the jury to consider is, whether they believe that a conveyance to the defendant, or those under whom he claims, was actually made." Whereas, in this case, the jury were told, that,

" if they believed the facts given in evidence, they would be authorized to presume that a legal partition had been made," &c. ; and were left to infer, that, after presuming a partition, they could also go on to presume a conveyance from the plaintiff to the defendants, or to those under whom they claim.

3. But whatever the law of other States or countries may be, certainly the Supreme Court of Tennessee has declared the law of that State to be, that the evidence in question is inadmissible, and that the presumption called for by the defendants cannot be made. Weatherhead v. Sewell, 9 Humph. 272; McCorry v. King's Heirs, 3 Humph. 267.

" There are certain rules of evidence which may be affirmed to be generally, if not universally, recognized. Thus, in relation to immovable property, inasmuch as the rights and titles thereto are generally admitted to be governed by the law of the *situs*, and as suits and controversies touching the same, *ex directo*, properly belong to the forum of the *situs*, and not elsewhere, it would seem a just and natural, if not an irresistible conclusion, that the law of evidence of the *situs* touching such rights, titles, suits, and controversies must and ought exclusively to govern in all such cases. So, in cases relating to the due execution of wills and testaments of immovables, the proofs must and ought to be according to the law of the *situs*." Story, Confl. of Laws, § 630 b.

" And perhaps it may be stated as a general truth, that the admission of evidence and the rules of evidence are rather matters of procedure than matters attaching to the rights and titles of parties under contracts, deeds, and other instruments; and therefore they are to be governed by the law of the country where the court sits." Ibid. § 634 a.

Therefore, whether we regard the law of evidence touching titles to immovables as a part of the law of titles, or as part of the law of procedure, either way the law of Tennessee must prevail, and the charge of the Circuit Court was erroneous.

*Mr. Fogg*, for defendants in error.

The acts of Assembly of the State of Tennessee in regard to wills of land are those of April, 1784, c. 22, and October, 1784, c. 10, § 6. Probates of wills in the County Court are sufficient testimony of the devise of real estate, and attested copies may be given in evidence in the same manner as the originals; but the original will must be produced under the requisitions of the proviso of the sixth section of the act of October, 1784. The probate of the paper writing called the will of Anthony Bledsoe before the County Court of Sumner, in October, 1788, was

in common form, where the devisees and next of kin had no notice.  Redmond v. Collins, 4 Devereux, 430–449.  The mode in which the probate was made in the County Court is not stated.   The statement of General Hall as to the declarations of Isaac Bledsoe, the executor, and his wife, which the General had communicated to Rogan, and which Rogan said was correct, was properly received before the original will was produced.   If the plaintiff had only offered the original, and proved Rogan's handwriting, then probably the defendants could not have attacked his testimony ; but with the copy, the plaintiff relied upon his evidence.  He was not only a subscribing witness, but a witness who was sworn before the County Court, and stated, as is to be inferred, that he became a subscribing witness, in the presence of the testator and at his request, to this paper as his will, and that this was his will, when he knew what the instructions were.   If he had been present to be cross-examined, the fact could have been shown by himself ; as he was dead, it is shown by his own declarations to Hall that he contradicted the idea that this was the will of Bledsoe, and thereby the effect of the probate was in some degree impaired, although in a slight degree, and was proper to be submitted to the jury.   The defendants held in their own right, by deeds of conveyance purporting to pass the legal title ; they did not claim under the will.   Blight's Lessee v. Rochester, 7 Wheaton, 535.   This paper writing is introduced to show that the land sued for was devised to Mrs. Weatherhead, and that thereby she had a title to the same. The *animus testandi*, the design and intention that the particular paper should be the last will and testament of the deceased, is the great and essential requisite of a will.   In a court of construction, the intention of the testator, as collected from a view of the whole instrument, is the guide to its correct exposition ; so, in determining the *factum* of the will, the *animus testandi* is to be gathered from the whole circumstances of the case.   In the words of Sir John Nichol in Zacharias v. Collis, 3 Philimore, 179, " the *factum* of an instrument means not barely the signing of it, and the formal publication or delivery, but proof that he well knew and understood the contents thereof, and did give, will, dispose, and do in all things as in the said will is contained."   It is not pretended that parol evidence can be admitted to contradict or vary the terms of a will, or to explain its meaning, except in cases of a latent ambiguity.   This cannot be done by a court of law or equity, acting as a court of construction.   Greenleaf on Evidence, § 275 et seq.   But though you cannot resort to parol evidence to control the effect of words or expressions which the testator has used, by showing

that he used them under mistake or misapprehension, nor to supply words which he has not used, yet you may, upon an issue of *devisavit vel non*, prove that clauses or expressions have been inadvertently introduced into the will contrary to the testator's intention and instructions, or, in other words, that a part of the executed instrument was not his will. 1 Jarman on Wills, 354, 355, et seq. Hippesley *v.* Homer, Turn. & Russ. 48, note. The remarks of Sir John Leach in the case of Earl of Newburg *v.* Countess of Newburg, 5 Maddock, 361. 1 Greenleaf, § 284. In order to ascertain whether the land in controversy was devised to Mrs. Weatherhead, and whether this was the last will of the testator, it is right to consider all the circumstances constituting the *res gestæ* at the time of the execution of the paper. 1 Greenleaf, § 108. In Smith *v.* Fenner, 1 Gallison, 170, the declarations of the testator before and at the time of making a will, and afterwards, if so near as to be a part of the *res gestæ*, were admitted to show fraud in obtaining the will. In the case of Reel *v.* Reel, 1 Hawks, N. C. 248, it was decided that evidence was admissible of the declarations of a testator made at any time subsequent to the execution of the will, which went to show that the testator believed the contents of the will to be different from what they really are ; or declarations by testator of any other circumstances which show that it is not his will are admissible. The same point was decided in the case of Howell *v.* Barden, 3 Devereux, 442 ; Hester *v.* Hester, 4 Devereux, 228. See also Mathews *v.* Warner, 4 Ves. jr. 186 to 210 ; Small *v.* Allen, 8 Durnf. & East, 147. The decision of the Supreme Court of Tennessee in Weatherhead *v.* Sewell et al., 9 Humphreys, 272, we contend, with great deference, proceeds upon the doctrine of refusing parol evidence to explain or add to a will in a case of construction, and does not apply to receiving evidence to show that no will ever existed. The evidence offered and received in this cause by the Circuit Court was legal evidence to show that there was no devise to complainant of an equal share of the land of Anthony Bledsoe, and the jury had a right to draw the conclusion that there was no will to that effect. The possession by defendants was for more than forty years, and none of the daughters or their husbands, as devisees, ever claimed under the will according to what is now contended for the plaintiff.

2dly. The Circuit Court did not err in their instructions to the jury upon the law of presumption. This question of presumption did not arise at all in the case decided in 9 Humphreys, before mentioned. The doctrine of presumption has been frequently discussed in the courts of Tennessee.

See Haines *v.* Peck's Lessee, Martin & Yerger, 228 to 237. Long-continued uninterrupted possession shall be left to a jury, as a ground upon which they may presume that deeds, grants, records, writings, facts, &c., which cannot now be produced, had formerly a legal existence. See 1 Meigs's Digest, p. 488, § 920, and cases there cited. Also, Chilton *v.* Wilson, 9 Humphreys, 399; Rogers *v.* Mabe, 4 Devereux, 188. In these cases, the defendants have had an adverse possession of more than forty years; partitions of the land sued for were made near fifty years before the suit was brought; the daughters and their husbands have had several possessions of the parts assigned to them, and large and valuable improvements have been made by defendants, and those under whom they claim, and the value of the land has increased near a hundredfold. David Shelby, who married one of the daughters, and who, in 1794, was guardian of Mrs. Weatherhead, and gave in her part of this land for taxes, was a man of great sagacity and intelligence, and clerk of the County Court of Sumner for more than thirty years. He never for himself claimed, nor did his wife after his death ever claim, any of the land except that which was assigned to her of the tract in controversy. Plaintiff and her husband lived on a part of this tract for near twenty years, and saw the other part claimed by strangers, who were making valuable improvements. In addition to all this, the records of the District Court of Mero were destroyed by fire in 1796, that being the court where bills for partition and settlement of estates of deceased persons would have been filed. Deeds of partition have been presumed in much less time. 5 Cranch, 262; 3 Phillips on Evidence, 357; 5 Monroe, 518; 3 Desaussure, 555; 2 Gill & Johns. 468. To this doctrine the only answer is, that Mrs. Weatherhead was a feme covert until 1843, and therefore the law of presumption does not apply. A married woman in England formerly could not make a deed, but could convey only by fine, which is matter of record. In this country she can convey by deed and private examination, which deed can be lost or destroyed, or she may be bound by partition ordered by a court of chancery, the records of which have been burned and destroyed. In Bunce *v.* Wolcott, 2 Connecticut, 27, one of the judges in delivering his opinion says: "Upon the point of presumption, I do not know that it is entitled to any weight. The feme covert and her husband were capable of conveying the property, it was their interest to do it on sufficient consideration, and the facts in this case warrant the presumption of their having done it." In Melvin *v.* Locks and Canals, 17 Pick. 255, the jury were allowed to presume, from certain facts and circumstances, that

a married woman had with her husband conveyed land, and that was in a case where, so far as appeared, the husband alone had conveyed.

In Barnard v. Edwards, 4 N. Hamp. 321, a right of dower accrued to a widow in 1797, who neglected to make any claim of dower until 1826; such neglect was held to be competent evidence to be submitted to a jury as proof of a release of the right, although she married again in 1798, and remained a feme covert during the residue of the time, and had resided out of the State during the whole time. Also Tyler v. Wilkinson, 4 Mason, 402.

In the Circuit Court, the case of McCorry v. King's Heirs, 3 Humphreys, 267, was cited to show that the principles of presumptive evidence would not apply to a feme covert, and it could not be presumed she had executed a deed. In that case the husband made a conveyance of the lands of the wife, she not joining therein. There the husband had estopped himself from suing, and the wife could not sue alone. The possession of the husband's vendee was consistent with, and subordinate to, the right of the wife and that of her heirs; the possession of the tenant for life was the possession of the remainder-man, and there was no adverse possession. See Guion v. Anderson, 8 Humphreys, 327. In the present case, Mr. Weatherhead, her husband, made no deed, and the defendants do not claim under him. That case therefore has no application, and where the facts and circumstances concur, a presumption can as well be made in the case of a feme covert as of one *sui juris*. On the doctrine of presumptions, see Angell on Limitations, 425 to 429; Greenleaf on Evidence, §§ 44, 45, *et seq.*

Mr. Justice WAYNE delivered the opinion of the court.

All of us agree — our learned brother who presided upon the trial of this case in the Circuit Court concurring — that so much of the testimony submitted to the jury, to show a different intention in the testator from that which his will discloses, was inadmissible. Weatherhead v. Sewell, 9 Humph. 272; Newburgh v. Newburgh, 5 Madd. 364; Miller v. Travers, 8 Bingh. 244; 1 Greenleaf on Evidence, 287, 289, and note.

But it was urged, as the *animus testandi* of a testator may be gathered from all the circumstances constituting the *res gestæ* of the execution of a will, that all and any of them may be used to prove that expressions and clauses were put into the will we are considering, contrary to the intention and instructions of the testator. Without denying altogether that proposition, or the illustration of it in the case of Hippesley v. Homer, Turn. & Russ. 48, we think it must be admitted,

that the testimony for such a purpose must be of facts uncon-
nected with any general declaration, or wishes expressed by a
testator for the disposition of his property by will.   Strode *v.*
Lady Faulkland, 3 Ch. 129; Brown *v.* Selwin, Cas. Temp
Talb. 240.   The only safe rule is, that, where a will is doubt-
ful and uncertain, it must receive its construction from the
words of the will itself, and no parol proof or declaration
ought to be admitted out of the will to ascertain it.   The tes-
timony offered in this case is of that character.   That which
was offered is the testimony of Hall and Mary Read.   Hall's
in this particular is a hearsay narrative received by him from
the executor, Isaac Bledsoe.   On that account it will not be
further noticed.   Mary Read's is not admissible, for she ad-
mits that she did not hear what the testator said " when the
will was writing, if he said any thing."   She does not say that
she heard the instructions given by the testator to Clendening,
the draughtsman of the will.   But she says " she recollects he
said he wanted his Kentucky and Holston lands sold, and the
proceeds applied to the education of his children; that he want-
ed a small tract of land given to his daughters at the discretion
of his executors; the balance of his land to be equally divided
among his sons."   Such testimony is altogether inadmissible,
either for the purpose of determining the *factum* of a will, or
to ascertain its intention.   " It would indeed be of but little
avail to require that a will *ab origine* should be in writing, or to
fence a testator round with a guard of attesting witnesses, if,
when the written instrument failed to make a full and explicit
disclosure of his scheme of disposition, its deficiencies might
be supplied and its inaccuracies might be corrected from ex-
trinsic sources."   In another view her testimony was inadmis-
sible.   There is no such uncertainty in the will, that it cannot
be carried into effect without the aid of extrinsic testimony.
Those words which are supposed to make it so, being void and
inoperative to convey any thing, when that has been deter-
mined, cannot be used to make something else in the will am-
biguous, which is certain of itself.   The words are, " to each of
my daughters a small tract of land," immediately after the
testator's declaration that he desired his estate to be equally
divided among his children.   *Estate* is a comprehensive term,
including all real and personal estate, and *children* has a legal
significancy, extending, as the case may be, to grandchildren
and even illegitimate children, but never permitting the term
*sons* to be substituted for it, unless such shall be the plain in-
tention of a testator in his will in favor of sons to the exclusion
of daughters.   Again, the testator says in the will, " my lands
and slaves to be equally divided amongst my children."   In

both the terms are intelligible. They do not admit of a doubt, and must have their operation, notwithstanding there may be an intermediate expression without any legal efficacy or certain meaning. We do not think it necessary to examine further, in connection with this case, how far parol evidence is admissible in cases of wills; or for what ambiguities in a will extrinsic testimony may be used to explain them. The case does not call for either. In 1 Jarman, 349, ch. 13, will be found a clear and satisfactory chapter upon the admissibility of parol testimony in cases of wills, illustrated by adjudicated cases. Mr. Wigram has placed before the profession the subject of extrinsic testimony in cases of ambiguity in wills with such ability and minuteness, that it has become a treatise of authority with judges and lawyers in England and the United States.

We will now pass on to the instructions which the court gave to the jury, concerning those presumptions which they might make from the evidence, against the plaintiff, in consequence of her supposed acquiescence in what is called a partition of the testator's lands; and that they might also presume that it had been done by the order of a competent tribunal. In respect to the first, it must be remembered that the plaintiff was an infant when her father died, a minor when she married, and continued covert until within a short time before she brought this suit. Under such circumstance of disability to pursue her rights in her father's estate with the aid of the law, no presumption can rightly be made against her. The rule in such a case is, that, when a person is under a legal incapacity to litigate a right in a court of justice, and there has been no relinquishment of it by contract, a release of it cannot be p esumed from circumstances over which the person has had no control, happening before the incapacity to sue has been removed. It is a general rule, having however a particular bearing in favor of married women, from the relations in which they are placed to property, and the legal disabilities resulting from coverture. It is not necessary to enumerate the latter. One of them is, that she cannot sue, without the assent and association of her husband, for any property which she owns, or to which she may become entitled in any of the ways in which that may occur. For this cause it is, that statutes of limitation do not run against them during coverture. The plaintiff here was protected by that of the State of Tennessee. No presumption could be made to defeat its protection, from any conduct imputed to her, or from her husband and herself having had for any length of time a part of the testator's lands in their possession, or from any sale made of it by her husband in which she may have joined. The law will pre-

sume it to have been done under the coercion of her husband. The fact mostly relied upon for the presumption, which the jury were told they might make, was her having united with her husband in making a sale to her brother of the land put into their possession by her father's executor, and that she subsequently acknowledged it when discovert. The last was no more than a correct avowal that it had been done, and that the deed was operative for so much of the land as it conveyed of that larger portion to which she was entitled out of her father's estate. Her brother, who had received a larger portion, knew very well with whom he was dealing, and the evidence shows that he could not have bought without knowing his sister's discontent with the division which had been made of the estate; and that her rights were only not asserted, to the extent of them, against himself and her other brothers, because she had no one to do for her, and could not then do for herself. We think that the exception taken to this part of the instructions must be maintained, and it is so, by this court.

The point still to be noticed is so much of the instruction given to the jury, informing them that they might presume from the evidence that there had been a legal partition of the testator's land in respect to his daughters by order of a court, when the executor assigned them certain parts of it. By the law of Tennessee, such a partition is a judicial act and becomes a record. It can only be proved as such records may be, and when it is alleged to have been lost or destroyed, its contents can only be reached by proofs of a certain and fixed kind well known in the law. In the proper sense of the term *presumed*, the records of courts are never so. The existence of an ancient record of another kind may sometimes be established by presumptive evidence. But that is not done without very probable proof that it once existed, and until its loss is satisfactorily accounted for. The rule in respect to judicial records is, that, before inferior evidence can be received of their contents, their existence and loss must be clearly accounted for. It must be shown that there was such a record, that it has been lost or destroyed, or is otherwise incapable of being produced; or that its mutilation from time or accident has made it illegible. In this last, though, not without the production of the original in the condition in which it may be. The inferior evidence to establish the existence of a judicial record must be something officially connected with it, such as the journals of the court, or some other entry, though short of the judgment or record, which shows that it has been judicially made. The burning of an office and of its records is no proof that a particular record had ever existed. It only lays the

foundation for the inferior evidence. If that cannot be got, the result must be, and is, that there has been an allegation of the existence of a record, without proof. There is no way of bringing it to the knowledge of others. Nor can it be said to be known certainly by him who asserts it. In this case, without any such proof, the jury was told that they might infer from the burning of the records of the county of Mero, and the conduct of the parties interested in the testator's lands, that there had been a partition according to law. If the instruction is put exclusively upon the want of proof to justify it, it could not be maintained. But it was contrary to the positive proof in the record. There is proof that the lands assigned to the daughters of the testator had been done by their uncle and their father's executor, without any legal order of partition. Hall says, Isaac Bledsoe, the executor, laid off the land to the four daughters of the testator in 1793. We will give his words. "About the time that Isaac Bledsoe was about to lay off the land to the four oldest daughters, witness was present, to wit, in 1793; and witness asked him what he considered would be a small tract of land under the will, when Colonel Bledsoe observed to him, that less than 320 acres would not make a good plantation, and that he intended to give his own daughters 320 acres each; and that he intended to assign to his brother's daughters 320 acres of the best of the land out of the Greenfield survey, and done so." The proof is positive, that the portions of that survey subsequently occupied by the daughters and their husbands, were assigned to them by the executor upon his own construction of the will, and without any order for a partition by any court. It repels all contrary inferences from any other evidence in the case.

We have sought to put this case upon the plainest footing in the shortest way, and without much which might have been written in support of our conclusion, from an unwillingness to embarrass it with what might have been proper, but which is not necessary.

The judgment of the Circuit Court is reversed.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Middle District of Tennessee, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to award a *venire facias de novo.*