· GEORGE EDSON *vs.* LORENZO E. MUNSELL.

An easement in the land of an insane person cannot be acquired by prescription, under the statutes of this commonwealth, until the expiration of such time after his death or the removal of his disability as would bar an action by him or his legal representatives for the land, no matter how long such disability may continue.

Upon the issue whether an owner of land was insane at the commencement and during the continuance of the time in which an easement therein by prescription is alleged to have been established, the books of assessors of taxes are competent evidence to show that the land was taxed to his guardian; and a bond, found on file in the probate office, and appearing to be an official bond of his guardian, though not bearing a certificate of the approval of the judge, may also be introduced, coupled with proof that, at the date of it, and for many years afterwards, no record of the appointment of guardians could be found in any book, and that the only evidence of the appointment of guardians at that time was their bonds upon the files, and also coupled with proof by the records that such guardian was subsequently removed, and another person appointed in his place.

TORT to recover damages for the obstruction of water in an aqueduct laid in 1813 from a spring on land of the defendant to a tub on land of the plaintiff.

At the trial in the superior court, before *Rockwell,* J., the plaintiff introduced evidence tending to show that for more than forty years from 1813 he and his grantors had had open, adverse and exclusive enjoyment of this easement, without interruption from the owners of the defendant's estate ; and he claimed a right by prescription, or by such and so long an enjoyment as furnished a presumption of a grant.

It was proved that Duty Partridge, from whom the defendant derived title, was under legal guardianship as a person *non compos mentis* from June 9th 1835 to the time of his death. He died September 26th 1856, aged sixty-nine years. A record of the probate court was introduced, which showed that in May 1835 the selectmen of the town of Wilbraham, in their official capacity, made a petition to the judge of the probate court, setting forth that Enoch Crocker, guardian of Duty Partridge, a person *non compos mentis,* had become by reason of age and other infirmities incapable of performing the duties of his trust, and praying that he might be removed from his guardianship, and some other suitable person appointed in his stead. Upon this petition, after due hearing, it was decreed that Crocker be

removed, and that Eliphalet Hancock be appointed in his place. The register of the probate court testified that, upon an examination of the records in his office, he could find no other evidence of the appointment of Crocker, except a bond, which he produced, found upon the files of the court for the year on which it bears date, purporting to be given by Enoch Crocker of Wilbraham as principal, with his sureties, to Samuel Fowler, judge of the probate court, and his successors in said office, and reciting that the said Crocker had been duly appointed guardian of Duty Partridge, Jr., of said Wilbraham, who had been adjudged by the inquisition of the selectmen of said Wilbraham to be a person incapable of taking care of himself. The penal sum of said bond was one thousand dollars; it bore date May 18th 1813; and it was conditioned for the faithful performance of the duties of his trust. There was no writing upon it to show that it had been approved by the probate court. The register also testified that at that time, and for many years afterward, no record of the appointment of administrators and guardians could be found in any book, and that the only evidence he had been able to find of such appointments' was the papers preserved upon the files of the court, and that in the case of guardians the only evidence of appointment he could find upon examination of the records previous to 1820 was their bonds which were upon the files.

In connection with the foregoing evidence, the defendant offered the bond in question, and also a book of the public records of the town of Wilbraham, to show that the assessors of said town for a series of years previous to 1835, taxed property to Enoch Crocker as guardian of Duty Partridge, as evidence tending to show that Crocker was the legal guardian of said Duty. And he offered the bond also as tending to show when the guardianship referred to in the record of 1835 commenced. But the judge excluded the evidence.

The defendant then offered to prove that Duty was in fact a person *non compos mentis* previous to the appointment of Hancock in 1835, during all the time the aqueduct had been maintained but the judge excluded this evidence also.

The jury returned a verdict for the plaintiff, and the defendant alleged exceptions.

*M. P. Knowlton*, for the defendant. The evidence that Partridge was under legal guardianship before 1835 was competent. *Battles* v. *Holley*, 6 Greenl. 145. *Stockbridge* v. *West Stockbridge*, 12 Mass. 400. So also was evidence to prove him *non compos mentis* before that time; because there could be no presumption of a grant from one in that condition. *Melvin* v. *Whiting*, 13 Pick. 184. *Watkins* v. *Peck*, 13 N. H. 360. Guernsey v. *Rodbridges*, Gilb. Eq. R. 3. *Bradbury* v. *Grinsell*, cited in 2 Saund. 175 *i.* Prescription has always been held by our courts to rest on the presumption of a grant. *Barnes* v. *Haynes*, 13 Gray, 192. *Thomas* v. *Marshfield*, 13 Pick. 248. *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 448. The original doctrine of prescription has become entirely merged in this more modern presumption, both as regards the length of time and the kind of use. *Lawrence* v. *Fairhaven*, 5 Gray, 115. *Luther* v. *Winnisimmet Co.* 9 Cush. 171. *Dana* v. *Valentine*, 5 Met. 13. Indeed, in this commonwealth, the same elements have been required to constitute a prescription as to establish such a presumption. *Arnold* v. *Stevens*, 24 Pick. 110. *Thomas* v. *Marshfield*, 13 Pick. 248. *Melvin* v. *Whiting*, 10 Pick. 297. *Gayetty* v. *Bethune*, 14 Mass. 52. And the remark of Judge Story in *Tyler* v. *Wilkinson*, 4 Mason, 401, was uncalled for, and is not authority. See *Gayetty* v. *Bethune*, above cited. *Sargent* v. *Ballard*, 9 Pick. 254. *Watkins* v. *Peck*, 13 N. H. 360.

*H. Morris*, for the plaintiff. 1. The use of the aqueduct from 1813 to 1861 established the plaintiff's title by prescription. *Coolidge* v. *Learned*, 8 Pick. 504. *Melvin* v. *Whiting*, 10 Pick. 295. *Kent* v. *Waite*, Ib. 138. 2 Greenl. Ev. §§ 538, 539. This title is established, although Partridge may have been insane. *Tyler* v. *Wilkinson*, 4 Mason, 401. 3 Kent Com. (6th ed.) 445. Title by prescription is founded on the common law, and not on any statute of Massachusetts. The notice to prevent the acquisition of an easement, provided by Gen. Sts. *c.* 90, § 34, may be given by the guardian of an insane person. 2. The use of the aqueduct for so long a time also furnished a conclusive presump-

tion of a grant. *Hill* v. *Crosby*, 2 Pick. 466, and cases cited in note. This presumption is not controlled by Partridge's insanity. The grant of an insane person, not under guardianship, is only voidable, and not void. 2 Bl. Com. 291. *Allis* v. *Billings*, 6 Met. 415. *Gibson* v. *Soper*, 6 Gray, 279. 3. There was no sufficient evidence of a guardianship before 1835. The petition of the selectmen for Crocker's removal, with the order of the probate court thereon, did not prove a legal guardianship, and certainly did not show how long such guardianship had existed. The appointment of a guardian can only be shown by the record. The bond is not a record, and bears no evidence of acceptance by the court, or of the time when it was placed among the papers of the court. Samuel Fowler was never legally judge of probate. *Commonwealth* v. *Fowler*, 10 Mass. 290. If Crocker was appointed guardian, there is nothing to show that such appointment was a legal one. *Chase* v. *Hathaway*, 14 Mass. 222. *Peters* v. *Peters*, 8 Cush. 544. The act of the assessors in taxing the property was *res inter alios.*

GRAY, J. The main question presented by this bill of exceptions is, how far evidence of the insanity of the owner of land is competent to defeat a title to an easement in it, claimed by prescription or presumption of a grant, resulting from open, adverse and exclusive enjoyment for more than forty years. A statement of the elements of our law of prescription, and a sketch of its history, will best develop the rules by which this question must be decided.

The doctrine of acquiring property in lands or easements by adverse possession or prescription was derived from the civil law, and recognized in England as early as the thirteenth century. The necessary qualities of such possession or use to confer a title, are clearly stated by Bracton, and have not since been varied. It must be long, continuous, peaceable, open, by the knowledge and tacit consent, and without the express permission, of the true owner. Bract. 51 *b*, 52, 221 *a.* As to the length of time requisite, Bracton says that the claimant of a servitude must show use for a time beyond the memory of man, which may suffice for right, *non quia jus deficiat, sed quia*

*actio deficit vel probatio.*  230.  The length of possession neces-
sary to give a right to land, without grant or livery, he says, is not
defined by the law, but by the discretion of the justices.  Yet
that discretion seems to have been guided by the limitation of
actions; for he immediately adds that any persons taking posses-
sion of lands, though without right, immediately have the free-
hold against strangers, and after long, continuous and peaceful
possession, bein to hold it against all the world — *incipiunt pos-
sidere quoad omnes, et habere liberum tenementum ita quod sine
brevi vel judicio ejici non possunt; quia sicut tempus est modus
inducendæ et tollendæ obligationis, ita erit modus acquirendæ
possessionis, longa enim possessio (sicut jus) parit jus possidendi
et tollit actionem vero domino petenti quandoque unam, quandoque
aliam, quandoque . omnem, quia omnes actiones in mundo infra
certa tempora habent limitationem.* 52. a.  When Bracton wrote,
writs of right (which had previously been limited by the reign of
Henry I.) had by the Statute of Merton, 20 H. III. c. 8, been
limited to the beginning of the reign of Henry II., or about
ninety-three years, the reason given for which by Bracton is the
impossibility of any one testifying, either of his own knowledge,
or even from what his father had told him, to anything beyond
that time.  Bract. 373 *a.*  Other civil actions also had already
their established periods of limitation.  Bract. 52 *a*, 102 *b*, 373 *a.*
1 Hale's Hist. Com. Law (5th ed.) 223, 224.

By the *St.* of Westm. I. c. 39, passed in 3 E. I., writs of right
could not be maintained on an older seisin than from the time
of Richard I., or about eighty-six years; and this limitation of
the highest writ to recover the freehold was applied by the courts
to the time of prescription, as being within the equity of the
statute.  2 Inst. 238, 239.  *Sedman* v. *Sedman*, 30 E. I. 59, 61.
2 Rol. Ab. 269.  The simple principle of not undertaking to go
back for proof beyond the memory of man having thus assumed
the form of a maxim that the reign of Richard I. was the limit
of legal memory, the law of England lost sight of the principle,
and kept the maxim, the absurdity of which increased year by
year.  At last, after the limitation of a writ of right had grown
to three centuries and a half, it was reduced by *St.* 32 H. VJ11,

*c.* 2, to sixty years. The reasons which had controlled the judges in extending the *St.* of Westm. I. to prescriptions would seem to have applied with increased force to the *St.* of H. VIII. But for reasons which do not appear this statute was construed with great strictness; Sir Richard Brooke, C. J. C. B. in the reign of Mary, thought that it applied to a title by prescription of anything of which it was necessary to allege seisin, but not to a claim of an easement; and in the time of the English Commonwealth it had ceased in practice to be applied to any prescription whatever. Co. Litt. 115 *a.* Bro. Ab. Prescription, 6 ; Limitations, 1, 2. Brooke's Reading on the Statute of Limitations, div. 2. Com. Dig. Temps, G. 1, 12, 13. 2 Rol. Ab. 269. *Coolidge* v. *Learned,* 8 Pick. 507, 508.

The founders of the Massachusetts Colony in the seventeenth century did not of course bring with them, as suited to their condition, a law which recognized only those rights by prescription which had begun in the twelfth century. But prescription was early recognized as a source of title in the law of Massachusetts. In Rolle's Abridgment are collected many cases of prescriptions held bad as against the public good, or against reason, or the law of the land, or common right, several of them decided in the reigns of Elizabeth and James I., not long before the emigration of our ancestors, and others taken from older books. 2 Rol. Ab. 265–267. The Massachusetts colonists, in the Body of Liberties which they established in 1641, went beyond this, and declared, " No custom or prescription shall ever prevail amongst us in any moral cause ; our meaning is, maintain anything that can be proved to be morally sinful by the word of God;" and this article was preserved in the subsequent revisions of the laws of the colony. Body of Liberties, art. 65. Anc. Chart. 177. The Body of Liberties, being rather a declaration of rights than a code of laws, did not define the time or elements of prescription ; but it did require the consent of the general court to " any conveyance or alienation of land or other estate whatsoever, made by any woman that is married, any child under age, idiot or distracted person;" and declared that " children, idiots, distracted persons, and all that are strangers or new

comers to our plantation, shall have such allowances and dis-
pensations in any cause, whether criminal or other, as reason.
and religion require." Arts. 14, 52. Neither of these articles
appears to have been afterwards reënacted. And there was no
saving of disabilities in the act of 1657, by which it was enacted
that "any person who either himself or by his grantors or as-
signs had before the law of 1652 (which required conveyances
of lands to be by deed acknowledged and recorded) possessed
and occupied as his or their own proper right in fee simple any
houses or lands within this jurisdiction, and should so continue
without disturbance, let, suit or denial legally made, by having
the claim of any person thereto entered with the recorder of the
county," and prosecuted to effect within five years next after the
20th of May 1657, should with his heirs and assigns forever after
enjoy the same. 3 Mass. Col. Rec. 422. 4 Mass. Col. Rec.
pt. 1, 288. The general court afterwards held that this act con-
firmed the title of the possessor, even if he had nothing to show
but his possession and the grant of the land was to another'
person. Ib. pt. 2, 515. Anc. Chart. 175.

Immediately after the Province Charter a similar act was
passed, which is printed in Anc. Chart. 216, but which was dis-
allowed by the king in council, because it contained no saving
of the rights of the crown, and required only three years' posses-
sion to confirm titles. Another act was accordingly passed in
1697, declaring that quiet, continuous and undisturbed posses-
sion for twelve years from the 1st of October 1692 should give
an absolute title in fee, with a saving of the rights of the crown;
a proviso that it should "not be understood to bar the title
of any infant, feme covert, or person *non compos mentis*, impris-
oned, or in captivity, who shall be allowed the term of seven
years next after such imperfection removed to pursue their
claim;" and an allowance to persons beyond sea of ten years
from the passage of this act. Prov. St. 9 W. III. c. 9, (ed.
1726) 90. Anc. Chart. 307. These were not mere statutes of
limitation of actions, but conferred an absolute title by adverse
possession, like the positive prescription or *usucapio* of the civil
law. *Beckford* v. *Wade*, 17 Ves. 88. They applied, however,

only to such possession beginning in 1692, and were probably occasioned by the unsettled state of titles immediately before the grant of the Province Charter.

The English statute of limitations of 32 H. VIII. (as amended by *St.* 21 Jac. I. *c.* 16, which did not however affect writs of right) was in force in Massachusetts until after the American Revolution. 6 Dane Ab. 106. Sullivan on Land Titles, 195.

In 1786 a new statute was passed, taken in great part from the English statutes, by the first section of which writs of right were limited to sixty years; by the second section writs of right on disseisin of ancestors and predecessors were limited to fifty years; and by the fourth section writs of formedon and rights of entry upon lands were limited to twenty years, with a proviso authorizing any person entitled to a writ of formedon or to make an entry upon land, and under age, *non compos,* or under other disability when his right first accrued, to bring such suit or make such entry within ten years after the expiration of said limitation of twenty years, or thirty years in all. *St.* 1786, *c.* 13. This proviso being confined to the writs of formedon and rights of entry mentioned in the same section, writs of right were absolutely barred in sixty years. This court held that since this statute the period of prescription must have the same limitation as a writ of right. *Coolidge* v. *Learned,* 8 Pick. 504. The *St.* of 1807, *c.* 75, reduced the limitation of writs of right to forty years, and of writs of entry upon disseisin of ancestors to thirty years, and did not otherwise modify the *St.* of 1786. By force of this *St.* of 1807, the period of prescription was fixed at forty years. *Melvin* v. *Whiting,* 10 Pick. 295. *Reed* v. *Northfield,* 13 Pick. 97. If those statutes had remained in force, the plaintiff's title by prescription would have been complete, although the person under whom the defendant claimed had been insane when his right accrued in 1813 and ever since; inasmuch as even an insane person could not have brought a writ of right after forty years, nor a writ of formedon, or of entry, either on his own disseisin or on that of his ancestor or predecessor, after thirty years; for the additional ten years allowed to persons under disability by the *St.* of 1786 did not run from the time of the

removal of the disability, but were simply added to the ordinary limitation of twenty years. *Melvin* v. *Proprietors of Locks & Canals,* 16 Pick. 168.

But before thirty years from 1813 had elapsed, the Revised Statutes were passed. It becomes necessary therefore to examine how far they have changed the period of limitation of real actions not already barred when they took effect. By those statutes, all writs of right and formedon, and writs of entry except on the demandant's own seisin, were abolished after the end of the year 1839; and the clause saving rights of those then under disability to bring one of the actions so abolished need not be considered, inasmuch as it expressly provided that no such action should be maintained after it would have been barred by the statutes of limitation in force when the Revised Statutes took effect. Rev. Sts. c. 101, §§ 51, 52; c. 119, § 11. A person whose title had accrued in 1813, and who had been then and ever since insane, had however, when the Revised Statutes took effect, a right to make an entry at any time before 1843 upon land of which he had been disseised, because the *St.* of 1786 allowed him thirty years for that purpose, consisting of the general limitation of twenty years, with ten years added by way of allowance for his disability when his title accrued. The Revised Statutes (following the example of the English Sts. of H. VIII. and Jac. I. and the Prov. St. of 9 W. III.) substituted, for those ten years after the expiration of the ordinary limitation of twenty years, ten years after the removal of the disability. Rev. Sts. c. 119, § 5. Commissioners' note to Rev. Sts. c. 101, § 51. The limitation of writs of entry, not barred when those statutes took effect, was thus varied, and a person then entitled to such a writ, but who had been under disability when his right accrued, might bring it at any time within ten years after the removal of his disability, no matter how long such disability might continue. The provisions of the Revised Statutes above quoted are reënacted in the General Statutes, c. 134, § 48; c. 154, §§ 5, 11.

The reasons indicated by Bracton, and which controlled the English courts in the construction of the *St.* of Westm. I., and ur own in the construction of the *Sts.* of 1786 and 1807, are

sufficient to show that since writs of right have been abolished, and writs of entry substituted as the proper form of action to recover the freehold, the limitation of writs of entry should be held the legal limit of prescription of incorporeal rights. And the period of twenty years has been assumed and declared by this court to be the term of prescription in many recent cases *Ashley* v. *Ashley*, 4 Gray, 200. *Lawrence* v. *Fairhaven*, 5 Gray, 114. *Sibley* v. *Ellis*, 11 Gray, 417. *Currier* v. *Gale*, 3 Allen, 330. *Leonard* v. *Leonard*, 7 Allen, 277.

The commissioners on the Revised Statutes suggested the propriety of fixing by statute the term of prescription for easements at twenty years, and of excluding from the computation the time of insanity or other disability, without confining it to disabilities existing at the beginning of the time. Commissioners' Rep. on Rev. Sts. *c.* 119, §§ 14–18. But the legislature did not adopt these suggestions, and merely provided that easements should not be acquired by use or enjoyment for a shorter time than twenty years. Rev. Sts. *c.* 60, § 27.

In *Currier* v. *Gale*, the court held that the adverse possession necessary to give a title by disseisin to land owned by a single woman was not prolonged by her marriage after such possession had begun, because the statute of limitations of real actions saved those disabilities only which existed when the right first accrued, and was not suspended in its operation by a disability subsequently intervening. Mr. Justice Merrick said, " The same rule must for the same reason prevail in relation to easements or other rights acquired by prescription, or to titles established and confirmed by open, adverse possession." 3 Allen, 330 Upon the same ground it has been held in other states that a prescription cannot be interrupted by a disability which does not come into existence until after the time has begun to run. *Mebane* v. *Patrick*, 1 Jones, (N. C.) 26, 27. *Wallace* v. *Fletcher*, 10 Fost. (N. H.) 434. *Reimer* v. *Stuber*, 20 Penn. State R. 463. The *dicta* of Mr. Justice Story in *Tyler* v. *Wilkinson*, 4 Mason, 402, on which the plaintiff relies, if fairly susceptible of a wider interpretation than this, are in conflict with the general current of authority, and can hardly be reconciled with the opinion of

the supreme court of the United States, as delivered by the same learned judge, in *Ricard* v. *Williams*, 7 Wheat. 109–111. If a person incapable of granting or consenting is to have no longer time to avoid a title by prescription than he would be allowed by the statute of limitations to bring an action for the land, he should at least be allowed the benefit of all the time which the statute does give.

The provision of the Gen. Sts. *c.* 90, § 34, for preventing the acquiring of an easement by notice from the owner of land, his agent or guardian, may have full effect, by applying it to persons who become insane after the beginning of the adverse use. And the object of that section was not to create easements, but simply to put restrictions on the mode of acquiring them. *Pierre* v. *Fernald*, 26 Maine, 442. *Rogers* v. *Sawin*, 10 Gray, 379.

If the time necessary to perfect a title by prescription to an easement in land is measured by any other rule than that derived by analogy from the statutes limiting actions to recover the land itself, it will be quite as difficult to establish such a title by the mere ordinary period of prescription against one who has been insane throughout the entire period.

It is an essential element of the use necessary to give a title by prescription, as laid down by Bracton, that it should be with the acquiescence of the true owner having the power to grant or interrupt the easement — *sine consensu expresso, per patientiam veri domini, qui scivit et non prohibuit, sed permisit de consensu tacito.* 52 *b. c.* 23, § 1. *Si autem in absentia veri domini utatur quis de patientia et permissione servientis, vel alterius qui jus non habet concedendi vel constituendi servitutem, talis usus non sufficiet, nec valebit ad possessionem acquirendam.* Ib. *c.* 22, § 2. The same principle has been repeatedly recognized by this court. *Sargent* v. *Ballard*, 9 Pick. 254. *Powell* v. *Bagg*, 8 Gray, 443. Bracton expressly says that an insane person cannot grant his estate, *quia donationi consentire non potest;* 12 *a*; nor lose his right of possession. *Cum semel possidere inceperint furiosi et mente capti, nunquam in tali statu desinere possunt possidere durante furore, non magis quam minor infra œtatem.* 375 *b.*

The ground upon which prescription has generally been pu

ill this commonwealth has been the presumption of a previous grant or agreement, which has been lost by lapse of time.  *Rust* v. *Low*, 6 Mass. 97.  *Gayetty* v. *Bethune*, 14 Mass. 53.  *Thomas* v. *Marshfield*, 13 Pick. 248.  *Nichols* v. *Luce*, 24 Pick. 103. *Morse* v. *Copeland*, 2 Gray, 305.  *Jennings* v. *Tisbury*, 5 Gray, 75.  *Powell* v. *Bagg*, 8 Gray, 443.  But a grant cannot be presumed against a person legally incapable of making it.  *Barker* v. *Richardson*, 4 B. & Ald. 579.  *Rochdale Canal* v. *Radcliffe*, 18 Q. B. 315.  An insane person cannot make a binding grant of his real estate.  A sale of the whole or part thereof might indeed have been made in 1813 by license of the court of common pleas or of this court for payment of his debts or for his support.  *Sts.* 1783, *c.* 32, § 2 ; *c.* 38, § 4.  But in the absence of evidence of any defect in the records of either of these courts, it is difficult to see how such a license can be presumed.  *Hathaway* v. *Clark*, 5 Pick. 490.  *Weatherhead* v. *Baskerville*, 11 How. 360.  There is no precedent for a sale of a mere easement out of the real estate of an insane person for the payment of his debts or maintenance.  *Watkins* v. *Peck*, 13 N. H. 377. And conclusively to presume a lost license to sell such an interest would be to carry the doctrine of presuming whatever is necessary to give validity to an imaginary grant farther than it has ever yet been carried.

The fiction of presuming a grant from twenty years' possession or use was invented by the English courts in the eighteenth century to avoid the absurdities of their rule of legal memory, and was derived by analogy from the limitation prescribed by the *St.* of 21 Jac. I. *c.* 21, for actions of ejectment.  It is not founded on a belief that a grant has actually been made in the particular case, but on the general presumption that a man will naturally enjoy what belongs to him, the difficulty of proof after lapse of time, and the policy of not disturbing long continued possessions.  2 Saund. 175 *note*.  *Hillary* v. *Waller*, 12 Ves. 239.  *Coolidge* v. *Learned*, 8 Pick. 508.  In order to require the jury to presume a grant, the possession or use must have all the qualities of a prescription ; it must be open, adverse, uninterrupted, and with the acquiescence of the owner.  Any fact

which directly affects the probability of such acquiescence must be submitted to the jury to assist them in determining whether such a presumption should or should not be made. *Daniel* v. *North*, 11 East, 374. *Ricard* v. *Williams*, 7 Wheat. 109, 111. *Melvin* v. *Proprietors of Locks and Canals*, 17 Pick. 260, 262. *Valentine* v. *Piper*, 22 Pick. 93. *Stevens* v. *Taft*, 11 Gray, 33. *Smith* v. *Miller*, Ib. 145. Best on Presumptions, 103, 105. Washburn on Easements, 70.

The defendant should therefore have been permitted to prove that Duty Partridge was in fact insane when the aqueduct was laid, and during all the time that it had since been maintained before the appointment of Hancock as his guardian in 1835.

The documentary evidence offered on this issue should also have been admitted. If Partridge was under guardianship as an insane person, it was the duty of the assessors of the town to tax his property to the guardian, and their books were therefore competent evidence that Crocker was this guardian in the years in which he appeared by those books to be so taxed. Stark. Ev. (4th Eng. ed.) 313. *Boston* v. *Weymouth*, 4 Cush. 542. *Pittsfield* v. *Barnstead*, 40 N. H. 477. And the bond of Crocker as such guardian, dated May 18th 1813 and produced from the files of the probate court, should have been admitted, in connection with the testimony of the register of probate, the record of the subsequent removal of Crocker from his guardianship, and the assessors' books, as evidence of the time of the beginning of that guardianship. *Gray* v. *Gardner*, 3 Mass. 399. *Battles* v. *Holley*, 6 Greenl. 145. Although the judge of probate then acting in this county had not been legally appointed, he held a commission from the executive, and was an officer *de facto*, whose judicial acts were lawful until reversed. *Commonwealth* v. *Fowler*, 10 Mass. 301. *Fowler* v. *Bebee*, 9 Mass. 231.

*Exceptions sustained.*